# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Timothy H.,                                         No. 24-cv-2627 (DLM)

        Plaintiff,

v.                                                                    **ORDER**

Frank Bisignano,
Commissioner of Social Security,

        Defendant.

---

Plaintiff Timothy H. seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). *See* 42 U.S.C. § 405(g). This matter is before the Court on the parties' briefs seeking judgment on the administrative record. (Docs. 5 (Plaintiff's motion for summary judgment), 6 (Plaintiff's memorandum), 8 (Commissioner's brief).) Both parties have voluntarily consented to the undersigned magistrate judge's review of this matter. For the reasons below, the Court affirms judgment in favor of the Commissioner.

## BACKGROUND

In August 2020, Plaintiff applied for SSI, and in January 2021, he filed for DIB, alleging in both applications that he had been disabled since May 2020. (Tr.[1] at 328–31, 335–36, 352–63). The Social Security Administration ("SSA") denied his claims initially and upon reconsideration. (Tr. at 75–184.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), and the ALJ held a hearing by telephone on the matter on November 18, 2021. (Tr. at 232–33 (request for hearing), 32–74 (hearing transcript).) Based on the record and hearing, the Commissioner issued an unfavorable decision on January 13, 2022. (Tr. at 8–28.) The SSA Appeals Council denied Plaintiff's request for review. (Tr. at 1–4.) Plaintiff then filed a federal action seeking judicial review, and the court remanded the matter to the SSA upon a voluntary motion for remand by the agency because the record contained an erroneous exhibit that belonged to a different plaintiff. *See Timothy H. v. Kijakazi*, 23-cv-351 (DTS) (Docs. 11 (Motion for Remand), 13 (Order for Remand)). Following this, the SSA vacated its decision and ordered the ALJ to update the evidence on Plaintiff's impairments and further consider his residual functional capacity ("RFC")[2] with supplemental evidence from a vocational expert, if necessary. (Tr. at 1299–1300.)

---

[1] The Commissioner filed the consecutively paginated transcript of the administrative record on September 3, 2024. (Docs. 4 through 4-3.) For ease of reference, citations to the transcript will identify the page number listed on the lower right corner of the document rather than the exhibit number and will treat the four parts as a single, continuous document.

[2] A plaintiff's RFC is the measure of the "the most [they] can still do despite [their] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

As ordered, a new ALJ received additional treatment notes into the record and removed the mistakenly included irrelevant portion. (Tr. at 1247, 1465–1537.) The new ALJ also held a new administrative hearing on March 19, 2024, eliciting additional testimony from a vocational expert based on the updated record. (Tr. at 1243–65.) Counsel represented Plaintiff at that hearing, and Plaintiff testified on his own behalf. (Tr. at 1243–45, 1249–57.) A vocational expert also testified, concluding that if Plaintiff were limited to light work with some postural and environmental limitations, he could still perform jobs in the national economy as a housekeeper (Dictionary of Occupational Titles ("DOT") No. 323.687-014), mailroom clerk (DOT No. 209.687-026), and merchandise marker (DOT No. 209.587-034). (Tr. at 1259.) Plaintiff's counsel also questioned the vocational expert during the hearing about the postural and fingering requirements for these identified roles. (Tr. at 1262–64.)

On May 1, 2024, the Commissioner again sent his notice of an unfavorable decision to Plaintiff. (Tr. at 1214–16 (notice), 1217–35 (decision).) The ALJ recognized that Plaintiff suffered from several severe impairments, including "lumbar degenerative disc disease with grade 1 L5-S1 spondylolisthesis, other unspecified arthropathies; depressive, bipolar, and related disorders; anxiety, personality and impulsive control disorders; posttraumatic stress disorder (PTSD); and alcohol use disorder (AUD)." (Tr. at 1220.) The ALJ also found a number of non-severe or not medically determinable impairments that have limited Plaintiff's functional abilities for at least a 12-month basis, including a cannabis use disorder, shortness of breath, right hand cramping, and dislocation of the

knees. (Tr. at 1221.) Despite Plaintiff's mental and physical impairments, the ALJ found that she did not qualify for benefits. (Tr. at 1234–35.)

First, the ALJ determined that Plaintiff retained the RFC to perform light work as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b), provided the job included additional postural and environmental limitations. The ALJ found that Plaintiff must only work in roles where he can avoid concentrated exposure to vibrations, extremely cold temperatures, hazards like working in uneven terrain or around unprotected heights, and the operation of heavy machinery or driving. (Tr. at 1225.) The ALJ likewise determined Plaintiff can only work in roles that require him to occasionally lift and carry 20 pounds, climb, stoop, or maintain superficial interactions with others like taking instructions, relaying information, or transferring materials. (*Id.*) The ALJ opined that Plaintiff can perform work that requires him to frequently carry 10 pounds, although he can only push or pull weight of no more than he can lift and carry. (*Id.*) Finally, the ALJ concluded that Plaintiff can sustain work requiring him to sit for up to six hours and stand or walk for up to six hours in an eight-hour workday, as well as to concentrate, understand, and remember routine, repetitive, or three to four step instructions, which the ALJ found should adequately accommodate his capacity to tolerate workplace stressors. (*Id.*)

Next, the ALJ credited the testimony of the vocational expert that although Plaintiff could not perform his past relevant work, he could still perform other work in the national economy as a housekeeper, mailroom clerk, and merchandise marker. (Tr. at 1234.) Because Plaintiff could still adjust to perform other work despite his limitations, the ALJ found him not disabled under the evaluative process set forth in 20 C.F.R. §§ 404.1520(g)

4

and 416.920(g). (Tr. at 1234–35.) Plaintiff chose not to file an appeal, making the ALJ's decision the final decision of the Commissioner. (Tr. at 1214–15 (describing the SSA appeals process, including an applicant's right to file a civil action in federal court).)

Plaintiff then filed this federal action seeking judicial review of the Commissioner's decision. (Doc. 1.) He challenges the ALJ's determination that he is not disabled, arguing that substantial evidence in the record as a whole does not support the ALJ's RFC determination about his mental impairment-related limitations. Plaintiff argues that to reach his conclusions, the ALJ cherry-picked record evidence on Plaintiff's mental impairments to inaccurately conclude that they cause at-most moderate limitations when they are far more severe. The ALJ then compounded his error, according to Plaintiff, by using these unsupported conclusions to pose hypothetical questions to the vocational expert that failed to capture the true impact of Plaintiff's mental impairments. Consequently, the vocational expert's testimony, Plaintiff claims, is unsupported by the record and cannot provide a sound evidentiary basis for the ALJ's conclusions. Plaintiff argues that this error is particularly egregious because the ALJ flouted the SSA Appeals Council's express directive on remand that the ALJ ensure any hypothetical questions posed to a vocational expert reflect the record evidence as a whole. Based on this series of errors, Plaintiff asks the Court to reverse the ALJ's decision and remand the matter for reevaluation by the SSA.

## ANALYSIS

This Court reviews an ALJ's denial-of-benefits decision to determine whether it is supported by substantial evidence in the record as a whole, and whether the decision is infected by legal error. 42 U.S.C. § 405(g); *Austin v. Kijakazi*, 52 F.4th 723, 728 (8th Cir.

2022). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also Nash v. Comm'r, Soc. Sec. Admin*, 907 F.3d 1086, 1089 (8th Cir. 2018) (characterizing "substantial evidence" as "less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions"). Courts reviewing ALJ decisions must look to the entire administrative record to ascertain whether it contains sufficient evidence to support the ALJ's conclusion. *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). When substantial evidence supports the ALJ's decision, the Court will not reverse, even if substantial evidence also supports a contrary outcome. *Nash*, 907 F.3d at 1089. But if an ALJ used erroneous legal standards, or if they incorrectly applied the law, those may be reversible legal errors. *Joel M. B. v. Kijakazi*, No. 21-cv-1660 (PAM/ECW), 2022 WL 1785224, at *2 (D. Minn. June 1, 2022) (citing *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011)); *Michael B. v. Kijakazi*, No. 21-cv-1043 (NEB/LIB), 2022 WL 4463901, at *1 (D. Minn. Sept. 26, 2022).

Plaintiff does not contest that the ALJ followed the five-step sequential process laid out in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) for evaluating DIB and SSI claims, respectively.[3] Rather, Plaintiff asserts that, in assessing his mental impairments and their

---

[3] Step one of this process involves determining whether a claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If not, the ALJ must next decide (in step two) whether the claimant's impairments are severe, and of a duration of at least 12 continuous months. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, an ALJ determines whether the claimant's impairments are severe enough to equal a listed

impact on his ability to perform work, the ALJ departed from the record evidence to conclude Plaintiff's mental impairments are less limiting than the full record suggests. As a result, the vocational expert's testimony based on that evidence was flawed. This, Plaintiff claims, resulted in a denial of benefits that is not substantially supported by the record, and the Court will now turn to that record to review Plaintiff's challenge.

## I.    THE ALJ'S STEP FIVE FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

At step five of the sequential process, the SSA considers whether a disability claimant can perform work, given their age, education, work experience, and RFC. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). Here, it is undisputed that Plaintiff cannot perform his past relevant work, so it is the Commissioner's burden to show that there are jobs available to him in the national economy, given his personal characteristics and limitations. *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). This Court reviews the ALJ's determination under the substantial evidence standard. *Ross v. O'Malley*, 92 F.4th 775, 778 (8th Cir. 2024).

Plaintiff argues that the hypothetical questions that the ALJ posed to the vocational expert at Plaintiff's second hearing did not reflect complete and accurate record evidence

---

impairment under Appendix 1 to Subpart P of Part 404. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If so, the claimant is considered disabled without further inquiry. If not, the ALJ must determine the claimant's residual functional capacity ("RFC") and decide (at step four) whether the claimant can still do their past work given their limitations. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, if the ALJ concludes a claimant cannot perform their prior work, step five requires the ALJ to determine whether they can do other work considering their RFC, age, education, and work experience. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

on Plaintiff's mental impairments. Plaintiff specifically claims that the ALJ misrepresented Plaintiff's difficulty with understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. Plaintiff contends that this failure demonstrates the ALJ's explicit disregard of the SSA Appeals Council's directive on remand that the ALJ ensure his "hypothetical questions . . . reflect the specific capacity/limitations established by the record as a whole." (Tr. at 1300.) The Court will first consider Plaintiff's claim that the ALJ cherry-picked evidence on the functional impact of Plaintiff's mental impairments.

**A.    Substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff has at-most moderate functional limitations stemming from his mental impairments.**

In evaluating the limitations a claimant's mental impairments impose, an ALJ is directed to consider four broad functional areas called "paragraph B" criteria: (1) the claimant's ability to understand, remember, or apply information; (2) the claimant's ability to interact with others; (3) the claimant's ability to concentrate, persist, or maintain pace; and (4) the claimant's ability to adapt or manage oneself. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). An ALJ must rate the degree of a claimant's impairment in each functional area based on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(4); *see also* SSA POMS DI 34001.032(F)(2), https://perma.cc/AA3X-XWFJ (last visited July 15, 2025) (describing the distinctions between each point on the severity scale in the Social Security Administration Program Operations Manual System ("POMS")). Here, the ALJ evaluated the record evidence on Plaintiff's mental impairments to assess the paragraph B criteria, determining that Plaintiff

8

had moderate or mild limitations in each functional area. The Court will take each of the four areas in turn below.

First, as to Plaintiff's ability to understand, remember, or apply information, the ALJ determined that Plaintiff had moderate limitations. (Tr. at 1223.) The ALJ found that while Plaintiff testified that he lacked the cognitive ability to perform past roles that required reading and use of his memory, Plaintiff also submitted two function reports stating that he had no difficulty understanding and following directions. (*Id.*) Similarly, the ALJ noted that although Plaintiff claimed that he needed reminders to go places and significantly relied on his parents, he did not require reminders for medication or personal care and could live alone. (*Id.*) The ALJ likewise found that while at least one mental status examination showed that Plaintiff struggled with poor insight and judgment, Plaintiff also tested in the average range for intelligence—including in verbal comprehension and working memory—and showed an above average ability to reason. (*Id.*) The ALJ also pointed out that Plaintiff appeared able to follow the content of his hearing without difficulty. (*Id.*) On this mixed record, the ALJ concluded the evidence amount to a moderate limitation in this functional area.

Next, as to Plaintiff's ability to interact with others, the ALJ found that Plaintiff also had a moderate limitation related to working with supervisors, coworkers, and the public. (*Id.*) The ALJ observed that Plaintiff testified he struggles with isolation, relies on his parents, lacks patience for social interactions, and finds interacting with authority figures challenging, which Plaintiff similarly endorsed in his function reports. (*Id.*) The ALJ noted that Plaintiff's mental health records show he struggles with feelings of anger and

irritability, and that he has anxiety and panic when in public settings or when required to interact with others. (*Id.*) Despite these mood-related concerns, the ALJ found the record on Plaintiff's activities generally demonstrated that Plaintiff could interact with others, including spending time with his parents and shopping in stores. (Tr. at 1223–24.) Thus, here again, on the mixed record before him, the ALJ concluded a moderate limitation appeared indicated.

As to Plaintiff's ability to concentrate, persist, or maintain pace, the ALJ concluded he had only a mild limitation. (Tr. at 1224.) The ALJ noted that Plaintiff's hearing testimony did not include concerns about focusing on work activities or staying on task at a sustained pace, although Plaintiff's function reports and treatment records include reports of difficulty with these functional abilities. (*Id.*) Yet when medical professionals administered standardized tests for deficits in these areas, the ALJ found it significant that Plaintiff tested within the normal range and had generally unremarkable mental status exams with generally normal attention and concentration. (*Id.*) The overall record, the ALJ concluded, suggested only a mild limitation in this area.

Finally, as to Plaintiff's ability to adapt or manage oneself, the ALJ determined that Plaintiff had moderate limitations in this area. (*Id.*) He acknowledged that Plaintiff claimed he has trouble with stress and changes to his routine in a work setting, but observed that Plaintiff's stress management appeared most acute in relation to non-work-related areas, including his disability application process, finances, and emotional regulation. (*Id.*) The ALJ also remarked on Plaintiff's struggles with suicidality and alcohol use, both of which he found show some limitations in Plaintiff's self-management. (*Id.*) But the ALJ also

determined that the record showed Plaintiff has attended psychotherapy but has been unwilling to take the prescribed psychotropic medications necessary to treat his conditions because of past negative medication-related experiences. (*Id.*) And the ALJ found it particularly significant that, even without medication, Plaintiff's mental health has not decompensated, and none of his medical providers have recommended more intensive treatment interventions like psychiatric hospitalization or residential treatment programs. (*Id.*) On balance, the ALJ concluded that, considering Plaintiff's ability to live alone and perform various self- and home-care functions independently or with some support from his nearby parents, Plaintiff's ability to adjust or manage himself does not merit greater than a moderate restriction. (*Id.*)

### *Hearing Testimony*

The ALJ relied on both subjective and objective record evidence to reach these conclusions above, and Plaintiff claims that the ALJ cherry-picked evidence that is not what a reasonable mind would find representative of substantial record evidence. Drilling down to test the record related to this challenge, as to subjective evidence, the ALJ pointed to Plaintiff's testimony about his mental impairment-related limitations during the hearing, as well as Plaintiff's answers provided in two function reports that he completed in support of his applications for disability benefits. (Tr. at 1251–52, 1255–57, 384–95, 408–17.) Reviewing Plaintiff's March 2024 hearing testimony, Plaintiff testified his social life is "[p]retty much non-existent" and involves shopping and seeing his parents. (Tr. at 1251.) He noted that he is able to do household chores and walk his dog, but that he cannot use a computer and finds reading difficult because of mental fogginess. (Tr. at 1251–52.)

11

Plaintiff claimed that he did not think that he could perform the intellectual work needed to complete inventory-related tasks required by his previous work because he would have to read, be mentally clearheaded and organized, and interact with people. (Tr. at 1255.) He noted he particularly lacks the patience for social interactions, explaining, "I start shaking and [my] breathing gets out of whack," and "I either have to go and try to isolate myself or I just have to leave . . . for the day." (Tr. at 1255–56.) Plaintiff also testified that he received assistance from his parents with household tasks, finances and bills, tracking deadlines and paperwork, and prompts to remember to do things. (Tr. at 1257.)

### Function Reports

A review of two function reports Plaintiff completed in October, 2020 and February, 2021 shows that he lives alone without dependents, cares for a pet, performs his own personal care unprompted, prepares his own simple meals, does household chores, shops, does not drive, has trouble being in public because of anxiety and panic attacks, does not manage his own finances or pay his own bills, visits his parents regularly and texts with them daily, and receives help from his parents to remember medical appointments and attend them. (Tr. at 384–88, 409–13.) The forms indicate Plaintiff experiences impairments that affect talking, hearing, memory, completing tasks, concentration, and getting along with others, although he confirmed they do not impact his ability to understand or follow instructions. (Tr. at 389, 413.) Plaintiff noted that although he struggles to pay attention, he generally finishes what he starts, can follow instructions although he prefers to take notes to avoid forgetting steps, struggles to get along with authority figures, and does not tolerate stress or changes to his routine well. (Tr. at 389–90, 413–14.) Plaintiff also

recounted his difficulty with weekly panic attacks, depression, and PTSD from a car accident that resulted in a traumatic brain injury ("TBI") affecting his memory, ability to read, and pace to complete tasks. (Tr. at 392–93, 414–16.)

Together with the subjective evidence above, the ALJ also supported his review of the paragraph B criteria with objective medical evidence from various sources. Sources that the ALJ and parties focus on include these four medical providers:

*NP Kastanek*

Nurse practitioner ("NP") Rebecca A. Kastanek, APRN, CPN, saw Plaintiff between October 2018 through August 2020 to treat him for post-concussive syndrome and pain. (Tr. at 459–533.) She generally found his mood and affect normal and noted he had appropriate insight, but also documented that his post-concussive symptoms included mental fogginess and difficulty with concentration and memory. (Tr. at 462, 473, 502–03, 509, 511, 522, 525, 533.)

*Dr. Vandermay*

Psychologist Julie Anna Vandermay, PsyD, MA, performed a psychological assessment of Plaintiff in February 2019 upon referral from Plaintiff's regular psychotherapist who expressed concerns about Plaintiff's memory issues, ability to remember instructions or complete tasks, and lack of motivation to perform activities of daily living. (Tr. at 934–45.) Dr. Vandermay found Plaintiff to have a good mood, logical thought process, appropriate attention and concentration, and an adequate memory to describe recent events. (Tr. at 936–37.) She administered a test measuring, among other things, his comprehension, reasoning, memory, and processing speed, and found that he

13

scored average in comprehension, memory, and processing speed, and very superior in his perceptual reasoning. (Tr. at 937–38.) As to his attention, Dr. Vandermay noted that his scores were variable, and he demonstrated memory and information organization and retrieval difficulty with below average recall of verbal information in some contexts. (Tr. at 938–40.) Dr. Vandermay also found that Plaintiff struggled to focus and concentrate on some tasks like scanning and basic processing of information, particularly with complex information. (Tr. at 938.) As to his processing speed, Dr. Vandermay concluded that Plaintiff could perform brief verbal and visual tasks that involved basic processing, but that as tasks moved from simple to more complex, he showed slowing rates indicating greater difficulty with cognitive processing. (Tr. at 938–39.) She also observed that Plaintiff appeared to have mild to moderate limitations in his ability to interact socially. (Tr. at 942.)

### *Dr. Sebas*

John A. Sebas, MD, saw Plaintiff between November 2021 and December 2023 for a variety of physical and mental medical complaints, including dizziness and depression. (Tr. at 1496–1537.) Dr. Sebas noted that Plaintiff had a history of decreased memory and ordered a magnetic resonance imaging test ("MRI") of Plaintiff's head, observing that the last MRI had been in 2018 and had been unremarkable. (Tr. at 1518; *see also* Tr. at 525–27 (2018 MRI results).) If this second MRI occurred, it does not appear in the administrative record. Otherwise, Dr. Sebas found Plaintiff's neurological and psychiatric examinations yielded generally normal results and he was regularly stable despite his mental illness. (Tr. at 1508, 1518, 1536.) For example, Dr. Sebas conducted an annual physical exam in November 2022 and found Plaintiff was relatively stable, although he

noted Plaintiff was struggling with his emotions and concluded that Plaintiff should qualify for disability benefits. (Tr. at 1524.) The assessment also noted that Plaintiff continued to decline medication to treat his bipolar and schizoid personality disorders, and that he was "drinking heavily about once a week." (*Id.*) In May 2022, Dr. Sebas noted that Plaintiff's significant mental illness, isolation, and dependence on family who live next door suggest Plaintiff cannot work and should be on disability benefits. (Tr. at 1534.)

### *LSW Webb*

Licensed social worker ("LSW") Jennifer Webb, MSW, LICSW, saw Plaintiff in September and October 2021, treating him for anger, anxiety, suicidality, isolation, and interpersonal problems. (Tr. at 1185–1209.) She found Plaintiff presented with an anxious, guarded, and irritable mood, obsessive and paranoid thinking, and poor long and short term memory. (Tr. at 1187.) Plaintiff reported to her that he wished to stop drinking but had been unable to stop, noting that previous attempts at sobriety had caused him to suffer from the "shakes." (Tr. at 1188.) Plaintiff also noted that he had serious difficulty with social interactions. (Tr. at 1189.) LSW Webb diagnosed him with the following disorders: depressive, panic, personality, alcohol use, and cannabis use. (Tr. at 1190–91.) Based on these disorders, she noted his common symptoms included racing thoughts, significant panic sometimes causing black outs with little warning, and antisocial and avoidant behaviors. (*Id.*) She also observed that Plaintiff needed to improve his insight and accountability, learn better ways to manage his mental health symptoms, and likely needed to address his substance use. (Tr. at 1191.) Tests that she administered showed that Plaintiff suffered from moderate depression and anxiety. (*Id.*) LSW Webb worked with Plaintiff to

set some goals to manage his anger and outbursts and to reduce his substance use. (*See, e.g.*, Tr. at 1203–04, 1207–08.)

\*    \*    \*

With this record in mind, the first question before the Court is whether the ALJ's conclusions on Plaintiff's paragraph B criteria rest on substantial support in the record, as the Commissioner argues they do. The substantial evidence in the record standard requires the Court to review both evidence that supports the ALJ's conclusions, and evidence that detracts from it. *See Montgomery v. O'Malley*, 122 F.4th 1059, 1063 (8th Cir. 2024). There must be enough evidence supporting an ALJ's conclusions that a reasonable mind would agree the decision makes sense—even if inconsistent conclusions could be reached—so long as the ALJ's conclusion is one of the possible conclusions. *Id.* The Court has studied the record above and finds that the ALJ considered the mixed record showing Plaintiff had some normal and some diminished functional abilities across the four mental assessment areas. The ALJ's conclusions represent, in the Court's view, one conclusion a reasonable mind could reach based on this mixed record.

Plaintiff disagrees with this finding. He focuses a significant portion of his brief on specific reasons why the Court should find that the ALJ's conclusions are incongruous with the bulk of the evidence. The Court has examined the record closely and respectfully disagrees, addressing Plaintiff's specific challenges below.

16

**1.      Substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff has at-most moderate functional limitations in the area of understanding, remembering, or applying information.**

Plaintiff argues the ALJ wrongly concluded that Plaintiff has moderate limitations in understanding, remembering, or applying information. While noting that Plaintiff lives independently with some parental reliance, Plaintiff claims that the ALJ then inconsistently observed that Plaintiff depends on his parents for basic activities like shopping. Although Plaintiff claims this is an inconsistency, the Court respectfully disagrees. Having reviewed the record above, the Court finds the evidence is mixed on how independently Plaintiff functions, and it is true that he lives alone and also true that he relies on his parents for some activities like paying his bills.

Plaintiff similarly argues the ALJ wrongly concluded that Plaintiff has moderate limitations in understanding, remembering, or applying information by distorting the record to downplay specialist-derived evidence while amplifying more general findings from nonspecialists. He argues that the ALJ downplayed Dr. Vandermay's highly relevant psychological assessment finding that Plaintiff struggled with his working memory, impacting his ability to be attentive and focused. Plaintiff contends that to justify an at-most moderate limitation, the ALJ focuses on mental status exams from other providers like NP Kastanek. The Court disagrees that the ALJ's analysis distorts the record. For one thing, the ALJ clearly considered Dr. Vandermay's report when weighing Plaintiff's functional abilities. (Tr. at 1225.) And NP Kastanek did not just find Plaintiff's mental status examination to be normal once, she did so repeatedly in the record over several years, as noted above. Other providers did too, such as Michael Taylor Massey, DO, treating

17

Plaintiff for low back pain, and Carrie LeBarron, PhD, LP, who assessed Plaintiff in a telehealth appointment. (*See, e.g.*, Tr. at 1138, 1173.) While they may not have been extensively treating Plaintiff for his psychiatric function or may have seen him through telehealth appointments, their examination results still constitute relevant record evidence on Plaintiff's memory, affect, and judgment. Taken together, the Court finds a reasonable mind could conclude that Plaintiff retained some functional ability to understand, remember, and apply information, even if he also had some limitations in these areas, resulting in a moderate limitation.

Plaintiff also claims that the ALJ ignored the effect Plaintiff's history of concussions had on his functional ability to remember. However, the ALJ considered Plaintiff's post-concussive syndrome, yet found the record did not support that this was a medically determinable impairment because it was not a consistently formalized diagnosis for Plaintiff across providers. (Tr. at 1221.) The record suggests that some medical providers considered but ruled out post-concussion syndrome, while others appear to have treated Plaintiff for the condition. (*See, e.g.*, Tr. at 83–84, 108–09, 113, 141, 459–533, 946.) The Court thus finds that while there is some evidence Plaintiff had experienced concussions and that some mental impairments related to understanding, remembering, and applying information might be attributable to post-concussive syndrome, it appears this was not a medical consensus and a reasonable mind could reach the conclusions that the ALJ did here.

Plaintiff also claims that the ALJ cherry-picked mental status examination results like those from LSW Kelsey R. Lynch that ignore the fact that suicidality was a continuous

concern for Plaintiff, undermining his cognitive abilities. (Tr. at 1466–94.) He claims that while he may have shown appropriate attention, concentration, memory, insight, and judgment at such appointments, chronic daily thoughts of committing suicide undermine the ALJ's conclusion that Plaintiff had only a moderate impairment in this area. (Tr. at 1472, 1479, 1486, 1494.) The Court understands Plaintiff's argument to be that thoughts of suicide establish a greater than moderate limitation in understanding, remembering, and applying information. This conclusion does not appear obvious to the Court, nor is it the Court's role to interpret medical evidence and reach an administrative conclusion in place of an ALJ. The ALJ considered evidence of Plaintiff's typically passive suicidal ideations in his opinion, particularly considering the effect of suicidal thinking on Plaintiff's functional ability to manage oneself. (Tr. at 1224, 1229–31.) While Plaintiff may wish that the ALJ had reached different conclusions about the effect of suicidal thinking on Plaintiff's ability to understand, remember, and apply information, the Court finds that substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff had moderate limitations in this area. This remains true even if there is some evidence that suicidal thinking conflicts with that conclusion where the bulk of the evidence appears to support the ALJ's conclusion. *See Montgomery*, 122 F.4th at 1063.

Plaintiff also argues that the ALJ failed to listen to at least one medical professional's opinion that Plaintiff should qualify for disability benefits. The ALJ acknowledged Dr. Sebas's medical opinion on this point but disregarded his conclusions as "neither inherently valuable nor persuasive" because they reached "an ultimate issue reserved to the Commissioner." (Tr. at 1232.) The Court agrees that this was proper

because whether an SSA claimant is disabled is an administrative determination only the Commissioner can make. *See* Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *2 (S.S.A. July 2, 1996) (observing the difference between medical issues about the nature and severity of a claimant's impairments, which are for medical professionals to determine, contrasted with administrative issues such as a claimant's RFC, whether they can do their past work, or whether they are disabled, which are administrative findings reserved to the Commissioner); *see also Jolene J.-D. v. O'Malley*, No. 23-cv-2297 (JMB/DLM), 2024 WL 3488001, at *6 n.8 (D. Minn. July 1, 2024) ("a medical professional may not translate their medical opinion or findings into the ultimate vocationally relevant limitation—that a person can or cannot work based on their evaluated impairments—because that opinion or finding would be disregarded as encroaching on a determination reserved to the Commissioner of Social Security"), *R. & R. adopted*, 2024 WL 3470786 (D. Minn. July 19, 2024).

> **2.    Substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff has at-most moderate functional limitations in the area of social interaction.**

Turning to the ALJ's conclusions about Plaintiff's moderate limitation interacting with others, Plaintiff claims the ALJ underestimated Plaintiff's level of limitation. Plaintiff points to evidence from Dr. Vandermay's February 2019 evaluation showing he struggles with emotional control and has significant emotional dysfunction, including that he may have temper tantrums and other anger-related problems that would result in a greater level of limitation. Yet the ALJ considered Plaintiff's issues related to "anger, irritability, anxiousness and panic and anxiety attacks especially in public settings and interactions

with others," but found that other record evidence such as normal mental status examinations, his ability to spend time with his parents, and his ability to shop in stores showed a greater level of limitation was not justified. (Tr. at 1223–24.)

Plaintiff also asks the Court to consider evidence from Dr. LeBarron who found Plaintiff struggles with communication because of cognitive slippage and suffers from a social anxiety disorder. (Tr. at 1176, 1179.) But Plaintiff "denied the symptoms of social anxiety" to Dr. LeBarron, noted that "his parents are his next door neighbors," and stated that he had been in a relationship for five years. (Tr. at 1172.) There is thus sufficient evidence to support the ALJ's conclusion that, while moderate limitations were present, greater limitations were not indicated.

### 3. Substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff has at-most mild functional limitations in the area of concentration, persistence, and pace.

As to concentration, persistence, and pace, Plaintiff objects to the ALJ's conclusion that Plaintiff had only a mild limitation in this area. Plaintiff argues that the ALJ failed to ask questions pertaining to this area in the hearing, then used Plaintiff's silence to support only a mild functional limitation. While this critique is fair, the ALJ's opinion does not appear to use Plaintiff's silence on this topic at the hearing against him. The ALJ instead points out that, even though the topic was not covered at the hearing, he found that evidence elsewhere in the record supported a conclusion that concentrating, persisting, and maintaining pace would present some challenges for Plaintiff.

Plaintiff again points to Dr. Vandermay's February 2019 psychological assessment discussed above, noting that she found Plaintiff had variable executive functioning skills,

difficulty taking initiative to begin tasks or activities, and trouble thinking through and carrying out tasks with multiple steps. (Tr. at 940–41.) While this is accurate, Dr. Vandermay's assessment also found precisely what the ALJ pointed out: that Plaintiff scored in the average range for comprehension, memory, and processing speed, and very superior in his perceptual reasoning. (Tr. at 937–38.) And the ALJ accurately pointed to other parts of the record showing that Plaintiff's mental status exam results rarely reflected problems with attention or concentration across different providers, as previously discussed. On this record, a reasonable mind might conclude that while Plaintiff had some limitations in his ability to concentrate, persist, or maintain pace, they were not so severe to exceed a moderate limitation. While Plaintiff asks the Court to consider the evidence and determine that Dr. Vandermay's test results demonstrate at least two "marked" limitations that would alter the ALJ's analysis of Plaintiff's paragraph B criteria and of related mental health listings,[4] this amounts to a request to reweigh the evidence which the Court is not permitted to do. *See Austin*, 52 F.4th at 731 ("Whether the ALJ should have provided additional limitations amounts to a disagreement over the weighing of evidence within the record, and 'it is not this Court's role to reweigh that evidence.'") (quoting *Schmitt v. Kijakazi*, 27 F.4th 1353, 1361 (8th Cir. 2022)).

---

[4] The term "listing" refers to step three in an ALJ's analysis in which they determine whether a claimant's impairments are severe enough to equal a listed impairment under Appendix 1 to Subpart P of Part 404. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

**4.    Substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff has at-most moderate functional limitations in the area of adapting and managing oneself.**

Turning lastly to Plaintiff's disagreement with the ALJ's conclusions about his moderate limitation in adapting and managing oneself, Plaintiff claims the ALJ made an unsupported claim that Plaintiff's providers did not recommend more intensive treatments for him. In fact, he argues, Dr. LeBarron suggested Plaintiff should consider occupational therapy, eye movement desensitization reprocessing therapy ("EMDR"), or an adult day treatment program. This is accurate and, in fact, Dr. LeBarron recommended an even more comprehensive list of 12 recommendations. (Tr. at 1180–81.) The Court does note that while some recommendations were listed in the imperative—such as "[i]mplement relaxation strategies" or "[m]aintain a consistent sleeping and eating pattern"—most recommendations (including the therapeutic options that Plaintiff mentions) were phrased as options for Plaintiff to "consider." (*Id.*) This hardly indicates that Dr. LeBarron thought Plaintiff should be immediately hospitalized or should clearly be attending an adult day program because of the severity of his lack of self-care.

Plaintiff also argues that the ALJ disregarded Dr. Vandermay's conclusions about Plaintiff's deficits in self-management involving limitations managing interpersonal interactions, as well as limitations managing multi-step tasks accompanied by difficulty holding the "big picture" in mind. (Tr. at 942–43.) Like Dr. LeBarron, Dr. Vandermay also listed recommendations in her evaluation, including that Plaintiff consider individual and group therapy, medications, and strengthening his executive function skills, among other things. (Tr. at 945.) While both Dr. LeBarron and Vandermay's reports support that

Plaintiff has some limitations in the area of adapting and managing oneself, and while both appear to suggest therapeutic supports to help Plaintiff increase his functional abilities, it is not the Court's role to look afresh at their test results or clinical recommendations and draw its own conclusions. Rather, the Court's role is to ask whether the entire record supports the moderate limitations the ALJ found in this functional area. The Court finds substantial support in the record for the ALJ's conclusions here that, while Plaintiff struggles with stress, changes to routine, emotional regulation, alcohol use, and suicidality, Plaintiff has declined medication, recognizes his need to keep a routine to manage himself, and lives alone with support from his parents. On balance, this supports the ALJ's conclusions, even if it could also support other conclusions. *See Montgomery*, 122 F.4th at 1063.

In sum, after carefully considering Plaintiff's arguments, the Court finds that a reasonable mind could agree with the ALJ's conclusions on Plaintiff's functional abilities under the paragraph B criteria, even if there is some evidence to the contrary concerning the difficulties Plaintiff has with these areas. The Court will next turn to how this sound evidentiary basis for the ALJ's paragraph B conclusions impacts Plaintiff's challenge to the vocational expert's testimony.

**B.    Because substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff has at-most moderate functional limitations stemming from his mental impairments, the ALJ could rely on the vocational expert's testimony based on that substantial record evidence.**

Because the ALJ's at-most moderate mental limitations are supported by substantial evidence in the record, the Court also concludes that expert testimony based on those

limitations provides a sound basis upon which the ALJ rested his conclusions. Specifically, the ALJ asked the vocational expert to opine on available jobs given the RFC crafted for Plaintiff that relied on his paragraph B mental impairment limitation findings. (Tr. at 1259.) The vocational expert testified that Plaintiff could still perform at least three "light work" representative jobs, including as a housekeeper (DOT No. 323.687-014), mailroom clerk (DOT No. 209.687-026), and merchandise marker (DOT No. 209.587-034). (*Id.*) The ALJ then reduced the hypothetical exertional level to "sedentary work."[5] Again, the vocational expert identified three representative jobs: address clerk (DOT No. 209.587-010), account clerk (DOT No. 205.367-014),[6] and bench sorter (DOT No. 521.687-086). (Tr. at 1259–60.) The vocational expert added that she had personally observed all six occupations she had identified as they are currently performed, and that she could confirm that they would fit the ALJ's hypothetical criteria. (Tr. at 1260–61.)

Plaintiff asserts that because the ALJ failed to paint the full picture of Plaintiff's mental impairments when posing hypotheticals to the vocational expert, the expert's responses were likewise incomplete and do not constitute substantial evidence for the

---

[5] Sedentary work "involves lifting no more than 10 points at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

[6] The ALJ noted that for the account clerk role, the fifth digit representing the amount of social interaction with others required was a six, as opposed to the least amount of interaction signified by the number eight for all of the other identified roles. (Tr. at 1260.) When questioned about whether this role's social requirements would exceed Plaintiff's limitations, the vocational expert explained that the role has changed over time with the advent of emails and form completion on a computer, no longer requiring someone to talk with others on more than an occasional basis. (*Id.*)

ALJ's conclusions.[7] "A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010) (citing *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005)). As discussed above, that was the case here. The hypothetical posed to the vocational expert was based on an appropriately tailored RFC, and it was not error for the ALJ to rely on the expert's responsive testimony. The Court therefore finds that the ALJ did not commit any error at step five of the sequential analysis, nor did the ALJ disregard the SSA Appeals Council's directive to base any hypothetical questions on the limitations established by the record as a whole.

## ORDER

Based on the above findings, as well as the files, records, and proceedings above,

**IT IS ORDERED** that:

1.     Plaintiff's request for reversal (Doc. 5) is **DENIED**; and

2.     The Commissioner's request for affirmance (Doc. 8) is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:      July 22, 2025                    *s/Douglas L. Micko*
                                          DOUGLAS L. MICKO
                                          United States Magistrate Judge

---

[7] Plaintiff was represented by the same attorney at his hearing before the ALJ and in this action, but counsel did not ask the vocational expert any questions about Plaintiff's mental limitations. (Tr. at 1262-65.) While not determinative, it is difficult to harmonize Plaintiff's critique that the ALJ asked myopic hypothetical questions to the vocational expert when Plaintiff's counsel—given the opportunity—did nothing to increase the aperture.